JACOBS, APPELLEE, *v.* FRANK, APPELLANT.

[Cite as Jacobs *v.* Frank (1991), 60 Ohio St. 3d 111.]

(No. 90-320—Submitted January 16, 1991—Decided June 5, 1991.)

*Robert D. Gary* and *Jori Bloom Naegele,* for appellee.

*Gallagher, Sharp, Fulton & Norman, Jay Clinton Rice* and *Kevin C. Alexandersen,* for appellant.

*Vorys, Sater, Seymour & Pease, John Winship Read, Timm H. Judson, Anthony J. O'Malley* and *Timothy G. Clancy,* urging reversal for *amicus curiae,* Virginia State Board of Medicine.

MOYER, C.J. Our disposition of this case begins with a determination

as to whether Frank has a qualified privilege pursuant to R.C. 2305.25 that protects the statements he wrote in his October 25 letter.[1] If the statements in Frank's letter are cloaked with a qualified privilege, Jacobs must prove Frank acted with "actual malice" to defeat the protection afforded by the statute.

## QUALIFIED PRIVILEGE

R.C. 2305.25 provides qualified immunity from suit to, among others, members or employees of utilization review, tissue, and peer review committees for actions taken within the scope of their functions. It also provides that: "* * * No person who provides information under this section and provides such information without malice and in the reasonable belief that such information is warranted by the facts known to him shall be subject to suit for civil damages as a result thereof." Thus, in addition to protecting the members and employees of the various review boards and committees, the statute extends limited protection to those who provide information to those review boards and committees.

The law and the public policy supporting it were stated in *Hahn* v. *Kotten* (1975), 43 Ohio St. 2d 237, 72 O.O. 2d 134, 331 N.E. 2d 713, as follows: " ' "A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he

---

[1] Frank's October 25 letter reads as follows:

"As per my conversation with your office, I am not filling out the report but, at your suggestion I am writing a letter, which I have been assured will be only for the eyes of your board.

"The above named Podiatrist served as a resident with me and the Ohio College of Podiatric Medicine, at Saint Vincent Charity Hospital and Health Center, from July 1, 1982 to June 30, 1983. He was then hired as an employed podiatrist at the Podiatry Medical Center, Inc., from July 1, 1983 to July 7, 1984.

"I do believe that this doctor was able to assume responsibility, however, I do not feel that he was ethical and honest. He did not have the ability to get along well with others. It is my opinion that his knowledge of his profession was good from an academic standpoint but poor from a clinical standpoint.

"There were both emotional and physical problems that he did not reveal to us when he signed his contract although the contract specifically asked for these. We were, of course, not satisfied with the doctors [*sic*] performance and we discharged him from Podiatry Medical Center, Inc., on July 7, 1984.

"We, of course, would not welcome him back in our facility. I do want you to know that the doctor sued both myself and the Ohio College of Podiatric Medicine because he was not able to be certified following completion of his residency. He at no time was told anything other than the fact that he would not be certified. He did not file a suit until after he was discharged as an employee of Podiatry Medical Center.

"Therefore, as you could understand, my judgement [*sic*] of this doctor's character would be poor and although he did not function well with our patients I would say his professional ability is adequate."

has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits.'' ' '' (Emphasis omitted.) *Id.* at 245-246, 72 O.O. 2d at 139, 331 N.E. 2d at 719, quoting *West v. People's Banking & Trust Co.* (1967), 14 Ohio App. 2d 69, 72, 43 O.O. 2d 197, 199, 236 N.E. 2d 679, 681.

The concept of a qualified privilege is based upon public policy and the need to protect the publication of a communication made in good faith. *Id.* at 245-246, 72 O.O. 2d at 139-140, 331 N.E. 2d at 719-720.

Frank appears to have written the October 25 letter in good faith. According to Frank's affidavit, he was reluctant to reduce his conversations with the Virginia board to written form for fear that Jacobs would see the written communication and institute a lawsuit. He finally relented and wrote the letter only after several requests from the board and with assurances that the letter would not be released to Jacobs. As we said in *Hahn*: " ' "It is generally held that if the defendant publishes the defamatory words to the person interested at the latter's request or solicitation, there is such a relationship between the parties to justify the communication." * * *' (14 Ohio App. 2d at

74 [43 O.O. 2d at 200, 236 N.E. 2d at 682], citing 1 Harper & James, The Law of Torts, page 445, Section 5.26.)" *Hahn, supra,* at 246, 72 O.O. 2d at 140, 331 N.E. 2d at 720.

Public policy concerns dictate that those who provide information to licensing boards pursuant to R.C. 2305.25 be given a qualified privilege in order to aid in the dissemination of information to those boards, thereby improving the quality of health care administered to the general public. See *Gates* v. *Brewer* (1981), 2 Ohio App. 3d 347, 2 OBR 392, 442 N.E. 2d 72.

Further, the public has an interest in ensuring that only qualified persons are licensed to practice podiatry. Toward that end, the October 25 letter was limited to addressing the issue of Jacobs's fitness to practice. It specifically states that it is for the board's eyes only. The letter was not intended for public dissemination. Frank felt he had an obligation to convey to the board his honest opinion of Jacobs's abilities as a podiatrist. Thus, we hold that Frank is afforded a qualified privilege pursuant to R.C. 2305.25 that protects the statements he made in the October 25 letter.

## ACTUAL MALICE

Since Frank has a qualified privilege with respect to the October 25 letter, Jacobs must demonstrate that Frank acted with "actual malice" in publishing the letter. As this court said in *Worrell* v. *Multipress, Inc.* (1989), 45 Ohio St. 3d 241, 249, 543 N.E. 2d 1277, 1284, rehearing denied (1989), 46 Ohio St. 3d 706, 545 N.E. 2d 1285: "* * * [O]nce the existence of privilege has been decided, the defense may be lost if the plaintiff proves that the defamatory statement was made with 'actual malice' as defined in *Hahn.* * * *'' Additionally, in order to recover, Jacobs must present clear and

convincing proof that Frank acted with actual malice. *Varanese* v. *Gall* (1988), 35 Ohio St. 3d 78, 518 N.E. 2d 1177, certiorari denied (1988), 487 U.S. 1206.

At issue is the appropriate definition of "actual malice" to be used when a qualified privilege exists in the context of the publication of peer review evaluations. The choice is between the public official defamation standard enunciated in *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, or the common-law actual malice standard. The *New York Times* public official definition of "actual malice" requires that the publication be made with knowledge that it was false or with reckless disregard for its truth or falsity. Public official actual malice requires more than evidence of ill will, spite, or ulterior motive; the libeled plaintiff must prove with convincing clarity that the defendant had a high degree of awareness of the probable falsity of the published statements. See *Dupler* v. *Mansfield Journal* (1980), 64 Ohio St. 2d 116, 18 O.O. 3d 354, 413 N.E. 2d 1187, certiorari denied (1981), 452 U.S. 962. Common-law malice, on the other hand, connotes "* * * (1) * * * hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.) *Preston* v. *Murty* (1987), 32 Ohio St. 3d 334, 512 N.E. 2d 1174, syllabus.

Unfortunately, several cases appear to confuse the two standards, and transmute "actual malice" as defined in a public official defamation action into the common-law standard. For example, paragraph two of the syllabus of *Hahn* says that: "A qualified privilege protecting the making of defamatory statements is exceeded when the statements are made with 'actual malice,' that is, with knowledge that the statements are false or with reckless disregard of whether they were false or not."

However, in the *Hahn* opinion, the majority says: "The correct rule as to the type of malice required to be established by plaintiff in connection with qualified privilege cases is simply and clearly stated in the Ohio Court of Appeals' decision of *DeAngelo* v. *W. T. Grant Co.* (1952), 64 Ohio Law Abs. 366:

" ' " * * * In the case of a privileged communication, however, express malice as distinguished from malice in law must be shown; that is to say, if the occasion be privileged, the plaintiff may not recover, although he proves that defendant used language actionable per se and that the same was false, unless he goes further and shows that in using same, defendant was moved by actual malice, such as ill will, spite, grudge or some ulterior motive." ' " *Id.* at 248, 72 O.O. 2d at 140-141, 331 N.E. 2d at 721.

In *Evely* v. *Carlon Co.* (1983), 4 Ohio St. 3d 163, 4 OBR 404, 447 N.E. 2d 1290, the court stated: "Once appellee asserted the defense that its statements were made in good faith, appellant had the burden of showing that appellee acted with actual malice and could not merely rely on allegations in the complaint.

"Here, a review of the material before the trial court upon the motion for summary judgment * * * would show that appellant had not sustained his burden of proof of malice in the publication of such alleged actionable defamations. In such material there was no showing of any ill will, spite, or some ulterior motive on the part of appellee's officers toward this appellant. * * *" *Id.* at 166, 4 OBR at 407, 447 N.E. 2d at 1293.

The cited cases and other appellate court decisions have caused some confusion regarding the applicable defini-

tion of "actual malice" in a qualified privilege case. Therefore, we hold that when a defendant possesses a qualified privilege regarding statements contained in a published communication, that privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice. In a qualified privilege case, "actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity.

Although communications to a peer review or licensing board may not be authored and transmitted with impunity, an obvious need exists for candor. The public has a right to feel secure in the knowledge that the professional services it receives are rendered by competent and qualified practitioners. In order to effectively screen applications from prospective practitioners, such boards must be able to receive frank, straightforward appraisals from those in positions to judge the applicants. More important, the evaluators must be free to make truthful professional judgments of an applicant's fitness to practice without fear of retaliatory lawsuits. Requiring a plaintiff to meet the more onerous evidentiary burden for actual malice as defined in this case will safeguard the interests of both the licensed practitioners and the people they serve.

Our determination that Jacobs was required to prove Frank acted with actual malice in writing the October 25 letter necessitates an independent review of the record to determine whether that standard was met. *Varanese* v. *Gall, supra.* See, also, *Grau* v. *Kleinschmidt* (1987), 31 Ohio St. 3d 84, 31 OBR 250, 509 N.E. 2d 399.

In his summary judgment motion, Frank asserted that he was entitled to summary judgment because he pos-

sessed a qualified privilege. To support his motion, Frank appended a letter from the board's executive director certifying that Jacobs had received his license to practice podiatry in Virginia on January 16, 1987; an affidavit executed by Frank; the form request from the board and the October 25 letter in response; and a copy of Jacobs's employment contract.

In his affidavit, Frank recited the history of his association with Jacobs. He indicated that he offered Jacobs a residency at the request of a friend, although he had declined the friend's initial request to hire Jacobs as an associate after discovering that Jacobs had not completed an accredited residency and that he was not board certified. Frank hired Jacobs upon completion of his "satellite" residency. However, the satellite residency did not receive accreditation. According to Frank, "Dr. Jacobs knew the satelite [*sic*] residency program was unapproved and at no time did I ever represent that the American Podiatry Association would approve the program. * * *" Frank said he was dissatisfied with Jacobs's work and professional demeanor, so he was discharged.

Frank also indicated that he felt the lawsuit Jacobs had initiated seven months after his discharge wherein he claimed fraudulent misrepresentation regarding accreditation of the residency program was without merit. Frank concluded that his evaluation of Jacobs had been predicated upon precontract negotiations, a two-year professional relationship, and Jacobs's filing of a meritless lawsuit.

In his brief opposing summary judgment, Jacobs attached his affidavit; his letter of resignation; a letter written by Frank in 1983 recommending Jacobs for staff privileges at Saint Vincent Charity Hospital; two favorable letters of recommendation

written by others in 1986 and 1987; a report dated October 1, 1984, summarizing student evaluations from a class taught by Jacobs; and a personal and confidential letter sent by Frank to the friend who had encouraged him to assist Jacobs.

In his affidavit, Jacobs averred that it had been his understanding that the satellite residency program was an approved program which would lead to accreditation. He said that the first time he learned the residency program had not been approved and would not be accredited was when he submitted his resignation letter on June 30, 1984. Jacobs referred to the professional evaluations received in 1986 and 1987 and to the student evaluations as evidence of his qualifications.

The 1986 and 1987 recommendation letters indicated Jacobs had been a good resident and staff member; the author of the 1987 letter felt he was articulate, intelligent, and moral. Both authors highly recommended Jacobs. The student evaluations contained both modest and superlative ratings. Student comments ranged from enthusiastic to mundane, *i.e.*, "great job" versus "very uptight[,] needs to relax." However, most of the student responses were in the "good" to "very good" range.

The personal and confidential letter to Frank's and Jacobs's mutual friends read: "I recently received a rather shocking letter from an attorney regarding Richard Jacobs. Since I would have had no contact with Richard in any manner or form if he were not recommended by you I feel that I must inform you about his current action.

"As you know I was under the impression on multiple occasions and discussions with Richard that he had been taking a residency in Omaha, Nebraska. I was most shocked to find out that what he had been working with was a non-approved preceptorship given by a group in Omaha, Nebraska. There were multiple phone calls from an attorney in Omaha that Richard had engaged regarding an association with me to my attorney in Cleveland, costing our organization upwards of $2,000.00. I finally felt that Richard had not been honest with me and on April 8, 1982 I sent him a letter which I am enclosing for you to read stating that Richard's business was concluded and at an end. You then personally called me and asked me what the problems were and I explained to you at that time that I felt Richard had not been honest with me and that without a residency he could not work in the hospital that I work and therefore we could not have an association. You asked me to help him and I then, after much struggle, much time and expense, was able to work out a satellite residency program in association with the Ohio College of Podiatric Medicine, thereby affording him an ontray [*sic*] to hospital privileges and an association with me. I personally paid for Richard's residency including the following; Stipend, Health Insurance, F.I.C.A., Worker's Compensation, Malpractice Insurance, and Administrative Costs. I in no way was obligated to Richard; he was not a relative, he was not the son of a friend, and in Podiatry many people had asked if I could help their sons obtain a residency. Richard received a residency and many other things from me only because of * * * [your] long and deep friendship * * * with * * * [my wife and me]. Richard was inadequate to receive a residency at any other place in this country. Richard did not even receive an approved preceptorship at any place in this country and the residency was given only because of this relationship between * * * [your

family] and * * * [my family]. I frankly did not even check Richard's qualifications until at a later time, because * * * [you] said he was the right type of person that was good enough for me. We even gave Richard a car allowance which was not in the residency contract and was not given to other residents at the College. The contract also said that the residency could be concluded at any time or terminated at my option, but we moved ahead even though Richard was unable to fulfill that contract for over four weeks due to an unspecified stomach upset, we moved ahead toward an associate contract. Richard signed this associate contract with the full knowledge that he was suffering from emotional problems that he chose not to disclose. Richard came to me with a problem that he owed a great deal of money and he did not know how he was going to pay it since his father had refused to help and said it was his responsibility. He asked if I would sign a note for him at the bank so he could pay some of his outstanding bills. I made it possible for him to have the money immediately and allowed him to work out the payment plan at his convenience. We treated Richard like a member of our family, entertaining him at various functions and in our home and presenting him to the community as our associate. I'm certain if you had known of the many problems surrounding Richard you certainly would not have suggested he be given a residency or be associated in my office. Both * * * [your family] and * * * [my family] were taken in and I can now understand why Richard talked so frequently about his unhappiness with his father and why his father refused further help.

"I had planned to forget all the problems that Richard Jacobs had caused me, problems in my professional life, loss of income and difficulty in our office management with Richard and the office personel [sic]. But since Richard is not the Richard that you and I thought he was, when this problem becomes public knowledge and this case is filed, we too will have to present those things that I have included for you and more.

"* * *

"P.S. I am at this time aware that Richard was being treated by a Clinical Psychologist in Omaha * * * for his emotional problems."

In his reply brief in support of his motion for summary judgment, Frank reasserted his qualified privilege and also alleged that since his October 25 letter was merely an expression of opinion, it was accorded absolute immunity from liability under the First Amendment, citing *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 25 OBR 302, 496 N.E. 2d 699. He attached another affidavit reiterating that Jacobs was fired, along with a copy of the termination letter Frank sent to Jacobs.

We consider next the sufficiency of the evidence Jacobs presented to show that Frank published his letter with actual malice: with knowledge that the statements were false or that he acted with reckless disregard as to their truth or falsity. In *Dupler* v. *Mansfield Journal, supra,* the court held: "* * * actual malice may not be inferred from evidence of personal spite, ill-will or intention to injure on the part of the writer. [Citations omitted.] * * * There must be a showing that false statements were made with a 'high degree of awareness of their probable falsity * * *.' [Citation omitted.] * * *" *Id.* at 119, 18 O.O. 3d at 356, 413 N.E. 2d at 1190.

"* * * Of course, the *New York Times* case refuted the idea that actual malice could be implied from the

character and content of a publication. * * * It is not sufficient for a libel plaintiff to show that an interpretation of facts is false; rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity." *Id.* at 122-123, 18 O.O. 3d at 358, 413 N.E. 2d at 1193. Once Frank asserted that his statements were made in good faith, Jacobs had the burden of showing that Frank acted with actual malice. At that point, Jacobs could not merely rely on the allegations he made in the complaint. *Evely* v. *Carlon Co., supra.*

We conclude that Jacobs failed to meet his burden of showing a genuine issue of fact exists with respect to the issue of whether Frank acted with actual malice. None of the issues that Jacobs claims are in dispute imputes actual malice to Frank; neither do they create issues of *material* fact. Whether Jacobs was fired or resigned from Podiatry Medical Center is immaterial to the determination of whether Frank acted with actual malice. Since we concentrate not only on the truth or falsity of the statement itself, but on the subjective belief of the author, *Varanese* v. *Gall, supra,* the important evidence is that which supports Frank's belief that he fired Jacobs. Jacobs's assertion that he resigned does nothing to alter Frank's belief that Jacobs was terminated.

Furthermore, nothing in the record confirms Jacobs's suspicion that Frank wrote the October 25 letter in retaliation for Jacobs's filing of the first lawsuit. In fact, even a cursory reading of the October 25 letter shows that Frank felt Jacobs was unethical and dishonest not because he filed the lawsuit, but because he filed the suit knowing that the allegations contained therein were false. In basing his opinion of Jacobs partly upon his filing of the lawsuit, Frank questioned Jacobs's

motivations for suing him since Frank believed that Jacobs sued only after he was terminated. In fact, the personal and confidential letter submitted by Jacobs strengthens Frank's point of view since it refers to an uninterested third party, the same information Frank sent to the board two years later.

Briefly, we must consider Frank's assertion that the October 25 letter is exempt from liability simply because it reflects his opinion. As the United States Supreme Court said in the recently decided case of *Milkovich* v. *Lorain Journal Co.* (1990), 497 U.S. ___, 111 L. Ed. 2d 1, 110 S. Ct. 2695: "* * * [W]e do not think this passage [referring to protection for 'opinion'] from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.' * * * Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact.

"If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' * * *"

"* * * But we think the ' "breathing space" ' which ' "freedoms of expression require in order to survive," ' [citations omitted], is adequately secured by existing constitutional doc-

trine without the creation of an artificial dichotomy between 'opinion' and fact." *Id.* at ___, 111 L. Ed. 2d at 18, 110 S. Ct. at 2702. Thus, the Supreme Court has determined that no special immunity or privilege is automatically granted to expressions of opinion. Frank's argument on this point is not well-taken.

Therefore, we conclude that no material fact remains in dispute and Frank is entitled to judgment as a matter of law. The decision of the court of appeals is reversed and the decision of the trial court is reinstated.

*Judgment reversed.*

HOLMES, H. BROWN and RESNICK, JJ., concur.

DOUGLAS and WRIGHT, JJ., concur in paragraphs one and two of the syllabus, and in the judgment.

SWEENEY, J., dissents.