SMITH, Appellee,

v.

PAPP, Appellant.

[Cite as *Smith v. Papp* (1996), 114 Ohio App.3d 442.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 69733.

Decided Sept. 30, 1996.

444

*Dworkin & Bernstein Co., L.P.A.,* and *Gary S. Okin,* for appellee.

*Alan Belkin Co., L.P.A.,* and *Alan Belkin,* for appellant.

JAMES D. SWEENEY, Presiding Judge.

Defendant-appellant Ted Papp appeals from the jury trial verdict in favor of plaintiff-appellee Daniel J. Smith. The cause of action was based on an allegedly defamatory informational campaign flier [1] associated with a United Automobile Workers' ("UAW") union shop chairman election at a General Motors Company ("GMC") automobile parts manufacturing plant located in Parma, Ohio. The literature generally impugned the fitness of plaintiff to hold elected union office and is actionable *per se.* For the reasons adduced below, we affirm.

A review of the record on appeal indicates that plaintiff offered the testimony of five witnesses during his case-in-chief. The plaintiff testified on his own behalf to the following: (1) he was employed at a GMC plant in Euclid, Ohio from 1976 to 1991, when, following a five-week period of being unemployed, he obtained employment at the GMC Parma, Ohio plant; (2) he first became involved in union politics in 1983 and has held a series of elected positions within the union since that time, having never lost an election for union office until the present election at issue herein; (3) union elections usually involve the use of campaign literature being distributed at the plant; (4) by virtue of his union positions he would receive additional income in the amount of approximately $8,000 to $10,000 per year, apart from his regular income for his own employment as a full-time union representative (shop chairman only, not alternate committeeman) which was paid for by GMC, through preferential overtime; (5) in 1993, he decided to run for the union position of alternate committeeman at the Parma plant, and did pass out campaign literature detailing his past experience in the union; (6) it was his own opinion, based on his previous campaigns for union office, that his chances for election were good, at least up until the publication of the offending literature, which detailed misinformation concerning plaintiff's performance as a union official at the Euclid plant and was distributed on a bulletin board and on tables in the Parma plant cafeteria; (7) the election, which contained five candidates in

---

1. It was stipulated that defendant wrote and distributed the objectionable literature at issue. The literature at issue is reproduced in the Appendix to this opinion.

total, was scheduled for May 25, 1993, and defendant's offending literature was distributed on May 21, 1993; (8) he distributed, approximately several days before the election, rebuttal literature in an attempt to correct the perceived misinformation contained in defendant's literature; (9) he lost the election by approximately thirteen votes, and blames the offending literature, which is full of inaccuracy and lies, for destroying his campaign and his political career within the union; (10) he did not know defendant before the offending literature was distributed, nor did defendant ever speak to the plaintiff concerning the allegations made in defendant's literature; (11) he earns approximately $19 per hour at the Parma plant; (12) defendant also was employed at the Euclid plant during the term of the plaintiff's union leadership there; (13) the financial incentive for becoming alternate committeeman is the potential for additional income through the use of overtime preference; (14) he never investigated whether the other candidates were employed at the Parma plant longer than he; (15) the winner of the election received thirty-nine votes to the plaintiff's twenty-six votes; (16) as a result of the election defeat, plaintiff had no change in his job classification, drop in his standard pay rate or loss of scheduled work hours; (17) the offending literature caused him emotional distress, yet he took no medication for it, nor did he miss any time from work, nor was he hospitalized or receive medical treatment.

The second witness for the plaintiff was Thomas Berg, who testified as follows: (1) he was employed at the Euclid plant from 1969 to August 1993 as a security officer and knew the plaintiff while plaintiff was employed there; (2) he saw copies of the offending literature at the Euclid plant, but he does not know how they came to be there; (3) he did not see defendant or anyone else actually distributing these copies.

The third witness for the plaintiff was Kent Lumeyer, who testified as follows: (1) he is a long-time employee of GMC, and has been employed at the Parma plant since 1991, when he oriented at the same time as the plaintiff; (2) he has served as an alternate committeeman for a period of two and one half years at another plant; (3) he supported plaintiff in plaintiff's candidacy, speaking in the candidate's favor to a number of persons after the offending literature had been distributed in an effort to sway their vote; (4) he observed defendant distributing the offending literature on the shop floor and in the plant cafeteria; (5) defendant told the witness that he (defendant) hated the plaintiff for the reasons stated in the offending literature; (6) he knows defendant and thinks one cannot believe everything defendant says, so the witness voted for plaintiff, thinking plaintiff was the right man for the job; (7) the election had low voter turnout and was a fairly close election; (8) it is the witness's opinion that the literature cost plaintiff the election because there were many people who did not know plaintiff, and after

reading the literature might believe the information in the literature; (9) the witness never worked at the Euclid plant; (10) some of the voters told the witness that they had voted for a candidate other than plaintiff based on the information contained in the offending literature.

The fourth witness for the plaintiff was Anthony DiLiberato, who testified as follows: (1) he is presently employed at the Parma plant and had worked in the past at the Euclid plant from 1977 to 1990 where he held union office as an alternate committeeman; (2) as an alternate committeeman, he obtained approximately $5,000 to $8,000 additional overtime income; (3) it is the witness's opinion that plaintiff did a good job as a union representative at the Euclid plant; (4) he saw copies of the offending literature at the Parma plant prior to the election; (5) he did not consider the allegations in the offending literature to be true; (6) he never saw defendant in the possession of the offending literature.

The fifth witness for the plaintiff was Peggy Smith, the plaintiff's wife, who testified as follows: (1) she is a long-term GMC employee, working at the Euclid plant from 1973 to 1991, then transferred to the Parma plant at the same time as her husband; (2) she has held elective union office in the past; (3) plaintiff had a very good reputation for honesty and integrity as a union officer at the Euclid plant; (4) she observed, with much resulting emotional distress, the offending literature at various places throughout the Parma plant a few days before the election; (5) she denied the allegations presented in the offending literature; and (6) although not elected or appointed within the union, she did fill in several times for her husband as shop chairman at the Euclid plant.

At this point the plaintiff's exhibits were admitted into evidence without objection. The plaintiff then rested and the defense moved for a directed verdict on all three of the remaining counts of the complaint. The basis for this motion was that the literature was qualifiedly privileged, that no malice was demonstrated, that reckless disregard for the truth or falsity of the information was not demonstrated, that there has been no demonstration of damages, and that there is no proof that plaintiff would have won the election but for the literature distributed by defendant. Subsequent to limited oral argument on the motion, the court denied the motion for directed verdict.

The defense offered the testimony of three witnesses during its case-in-chief. The defendant testified on his own behalf as follows: (1) he has been a GMC employee since 1963, worked at the Euclid plant from 1988 to 1990, and since 1990 has been employed at the Parma plant; (2) he grew to be critical of plaintiff's union-related abilities and decisions through several brief personal observations/interactions while at the Euclid plant; (3) he was a voter in the contested election at issue; (4) he feared a successful candidacy by plaintiff would have a detrimental impact on the Parma plant labor operation in much the same

way as defendant believed was caused by plaintiff at the Euclid plant; (5) prior to distributing the literature, defendant only exchanged brief pleasantries with the plaintiff when they would come in contact at the Parma plant, not maintaining a personal relationship outside the plant or outside the scope of union activities; (6) his purpose in writing and distributing the literature was to alert the potential voter to the plaintiff's perceived shortcomings as a candidate for union office, to encourage the potential voter to investigate the allegations contained in the literature and prove to the writer that his information was not correct, and to hopefully see that anyone but plaintiff wins the election; (7) he spoke with Mr. Corley, whom he trusted, approximately half a dozen times prior to distributing the literature discussing incidents at the Euclid plant; (8) only personal observation or verified information was discussed in the literature; (9) he distributed a total of one hundred copies of the literature, copied on yellow-colored paper,[2] approximately four days prior to the election, placing them only within the confines of his district within the plant; (10) he did not post or distribute any copies outside the department, in the cafeteria, or outside the Parma plant; (11) he distributed the literature with enough time before the election to be fair and allow time for open discourse, investigation by the voters and rebuttal by the candidate; (12) he does not hate the plaintiff, nor did he ever state to anyone that he hated the plaintiff; (13) he has held union office in the past; (14) he did not state in the literature which allegations were his personal opinion based on his own perception/interpretation of an occurrence; and (15) many of the persons who allegedly told him some of the information in the literature have either not been asked to testify by defendant or defendant cannot name that person.

The second witness for the defense was James Corley, who stated as follows: (1) he had worked at the Euclid plant for sixteen years before being employed at the Parma plant beginning in September 1991; (2) he presently holds the union office of alternate committeeman; (3) he and plaintiff worked together as elected union officers at the Euclid plant; (4) although he has nothing against plaintiff personally, he did not care for plaintiff as a union representative, believing plaintiff was too much a company man and did not handle criticism well; (5) he corroborated a number of allegations contained in the offending literature, to wit,

---

2. Although not discussed by the parties, defendant's choice of yellow-colored paper is curious for a reason unrelated to the allusion to cowardice. Historically in labor circles, union members who believed that their leadership had negotiated a contract with management that was too favorable toward management would apply the highly charged derogatory term "yellow dog contract" to that bargaining agreement, concurrently expressing their displeasure with perceived shortcomings in the union officials' representation abilities. The use of "yellow dog" contracts, wherein the employee would sign, as a condition of employment, an agreement with the employer not to join or remain a member of a union, was banned by the Norris–LaGuardia Act of 1932. Limited exceptions to the Norris–LaGuardia Act were subsequently allowed by the Taft–Hartley Act of 1947 and Landrum–Griffin Act of 1959.

reduction of break time at the Euclid plant during plaintiff's union representation there, that a nonunion leather company was allowed to come into the plant, and hearing plaintiff referred to as "no balls"; (6) he did speak several times with defendant about plaintiff's union activities at the Euclid plant prior to the election at issue; (7) he did not consider the Euclid plant labor operations to be outrageous when he left that plant, which was after plaintiff had already left; and (8) he has never seen campaign literature of this nature before this.

The third witness for the defense was Walter Kijek, who testified as follows: (1) he has been employed at the Parma plant for thirty years and is presently the UAW shop chairman, the top union officer at that plant; (2) in 1990, the position of alternate committeeman lost super seniority with regard to overtime, thus making the position subject to normal overtime equalization (which procedure hinges on where the employee is on the accrued overtime list, to wit, if he is high man on the amount of overtime already worked, that person does not get to work the upcoming overtime until those employees with less accrued overtime have the opportunity to work the upcoming overtime, thereby achieving equalization of overtime for all employees) unless the committeeman is absent, in which case the alternate committeeman at that time gets the super seniority and its preference to overtime due the committeeman; and (3) he would not be surprised if the present alternate committeeman, who won the election at issue, received approximately $10,000 per year in overtime as a result of his union position.

At this point the defense rested its case. The defense renewed its motion for directed verdict, which motion was again denied by the trial court. Subsequent to closing arguments and instructions to the eight-person jury, a unanimous verdict was returned in favor of plaintiff in the amount of $12,000 in compensatory damages and $2,031.25 in punitive damages plus attorneys fees.

This timely appeal followed, presenting three assignments of error.

I

"Since Smith presented no material from which a finding of actual malice by Papp could be made the trial court should have granted Papp's motion for directed verdict made at the end of Smith's evidence and/or Papp's motion for directed verdict made at the close of all evidence."

Civ.R. 50(A)(4) establishes the standard governing motions for directed verdict and provides as follows:

"*When granted on the evidence.* When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion

upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

In considering a motion for a directed verdict, the court does not weigh the evidence or try the credibility of witnesses. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469. The court is required to construe the evidence presented most strongly in favor of the nonmoving party, and if there exists any evidence of substantial probative value in support of the nonmoving party's claim, the motion should be denied. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68–69, 23 O.O.3d 115, 116–117, 430 N.E.2d 935, 937–938.

In the context of this assignment, defendant argues (1) that he demonstrated the defense of "qualified privilege" in the making and publication of the literature at issue sufficient to grant a motion for directed verdict and, in the alternative, (2) that the element of "actual malice" was not demonstrated by clear and convincing evidence by the plaintiff, who was acting in the role of a public figure while running as a candidate for union office, sufficient to defeat the qualified privilege. By virtue of the failure to argue their existence in his brief, it is conceded on appeal by defendant that the remaining common-law elements of defamation have been demonstrated by the plaintiff.[3]

Turning our attention to the issue of qualified privilege, we note that the availability of this defense is presumed by the defendant in his argument. As the record and argument of plaintiff demonstrates, this presumption is premature, as it must first be demonstrated to our satisfaction that the defense applies to the communication at issue.

The standard of review for whether a communication is qualifiedly privileged was stated in *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 113–114, 573 N.E.2d 609, 612, citing *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 245–246, 72 O.O.2d 134, 139–140, 331 N.E.2d 713, 719–720, as follows:

---

**3.** The common-law elements of defamation in Ohio are stated in *Stow v. Coville* (1994), 96 Ohio App.3d 70, 644 N.E.2d 673, as follows:

"In an action for defamation, under Ohio law, the plaintiff must prove that the defendant made a false statement of fact about the plaintiff that tended to harm the plaintiff's reputation. *Ashcroft v. Mt. Sinai Medical Ctr.* (1990), 68 Ohio App.3d 359, 365, 588 N.E.2d 280, 283. The statement must have been published, or communicated, to a third person and have caused actual harm to the plaintiff personally or in his trade or business. *Id.* The plaintiff must prove the defendant's fault, and, when the plaintiff is a public official or other public figure, the degree of fault required is actual malice. *New York Times v. Sullivan* (1964), 376 U.S. 254, 279–280, 84 S.Ct. 710, 724–725, 11 L.Ed.2d 686, 706." *Stow,* 96 Ohio App.3d at 72–73, 644 N.E.2d at 675.

" 'A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in *good faith* on any subject matter *in which the person communicating has an interest,* or *in reference to which he has a duty,* is privileged if *made to a person having a corresponding interest or duty,* even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. *The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.* The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits. * * * '

"The concept of a qualified privilege is based upon public policy and the need to protect the publication of a communication made in good faith. * * * " (Emphasis added.)

■ Reviewing the record in a light most favorable to the plaintiff/nonmoving party, we conclude that there is sufficient evidence presented which brings into question whether the literature published by defendant is privileged, thereby mandating a denial of the motions for directed verdict. This is so for at least three reasons. First, the element of defendant's good faith in the making of the communication is open to debate, particularly where (1) the defendant admitted on the stand that the substance of one of the allegations (regarding the appointment of the wife to a union position) was impossible for plaintiff to have done and was therefore untrue when made, and (2) it could be inferred that defendant lied during his testimony when he stated that Corley had told him that plaintiff had conducted secret meetings with the management at the Euclid plant, which information was denied by Corley during examination. Second, the reference in the literature to Mrs. Smith having "more balls" than plaintiff as a union official refutes defendant's contention that the communication was limited to its scope and purpose, which was to criticize plaintiff's activities and decisionmaking as a union official. Third, there was evidence that the literature was published in areas well outside the voting district within the Parma plant. Accordingly, the trial court properly denied the motions for directed verdict on the issue of applicability of qualified privilege.

■ Assuming that the qualified privilege did attach to the communication, which necessarily would require a clear and convincing demonstration of actual malice to defeat the privilege, *Jacobs v. Frank, supra,* at 116, 573 N.E.2d at 614, we now turn our attention to the issue of "actual malice" as it relates to the ruling on the motions for directed verdict. We are mindful that in a qualified privilege case, " 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Id.*

Reviewing the record, we find that there exists more than some evidence to support the claim of plaintiff that defendant exhibited actual malice in the publication of the communication, thereby overcoming the application of a directed verdict. This evidence consists of the following: (1) the falsehoods detailed in the discussion above on the issue of good faith; (2) the denials by Corley concerning a number of points of information asserted by the defendant as having been divulged by Corley; and (3) the lack of reasonable prepublication investigation by defendant into the truth of the published information relative to much of the union-related activities of plaintiff, despite the ready availability of sources with which to check those statements in the communication, thereby showing a reckless disregard for the truth.

The first assignment of error is overruled.

## II

"Since the campaign flyer written and distributed by Papp was clearly protected political speech the jury's verdict in favor of Smith was against the manifest weight of the evidence."

■ In this assignment, defendant argues that the communication is constitutionally protected opinion. Analyzing the merits of this assignment, we are cognizant of two standards of review which must be applied to the case *sub judice.* First, in reviewing an argument based on manifest weight of the evidence, we note that a judgment will not be reversed as being against the manifest weight of the evidence if there is any competent, credible evidence to support it. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Second, whether a particular communication is protected opinion depends on the application of a four-part "totality of the circumstances" test enunciated in *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182, syllabus, which provides as follows:

"When determining whether speech is protected opinion a court must consider the totality of the circumstances. Specifically, a court should consider: the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared.

(*Scott v. News–Herald* [1986], 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, approved and followed; Section 11, Article I of the Ohio Constitution, applied.)"

■ As to the first element of the *Vail* test, the court must determine "whether a reasonable reader would view the words used to be language that normally conveys information of a factual nature or hype and opinion." *Id.* at 282, 649 N.E.2d at 186. Upon reading the communication published by the defendant, it is inconceivable that any reasonable reader would construe the general context of the information contained therein in any light other than fact. Additionally, nowhere in that communication is it stated or intimated that the statements are the author's opinion.

As to the second element of the *Vail* test, the court in *Vail,* 72 Ohio St.3d at 283, 649 N.E.2d at 186, stated:

"Does the author imply that he has first-hand knowledge that substantiates the opinions he asserts? Where the ' " * * * statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." ' "

In the present case, the author claimed firsthand knowledge on a number of statements and implied firsthand as to others. We conclude that the factfinder, which is charged with weighing the credibility and weight of the evidence, could justifiably determine that this element of *Vail* was satisfied by the plaintiff.

As to the third element of *Vail,* while the communication seethed with hostility toward the plaintiff, the general tenor of the communication is one of factual reporting.

As to the fourth element of *Vail,* the overall nature of the communication was one of factual reporting, not subjective personal opinion.

Having applied the *Vail* test to the facts before us, it is the opinion of this court that the weight of the evidence supports the determination of the jury that the communication is not protected speech.

■ Finally, defendant's reliance on Section 101(a)(2) of the Labor Management Reporting and Disclosure Act, Section 411(a)(2), Title 29, U.S.Code is misplaced since the Act's provisions apply to actions concerning a union's reprisal against its members relative to the protection of a member's freedom of speech, not to a situation as here between two individuals. See *G.P. Reed v. United Transp. Union* (1989), 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665.

The second assignment of error is overruled.

### III

"Even if Smith had properly proven defamation Smith presented no proper proof of damages."

■ Appellant's assertion that plaintiff presented no proof of damages is not supported by the record. The testimony at trial demonstrated that plaintiff had emotional distress, humiliation and depression following the publication of the communication, causing a loss of rental income when his lethargic state caused him to forgo outside interests and the loss of reasonably anticipated additional income from having lost a close election for the alternate committeeman position, which according to testimony was within plaintiff's grasp prior to the publication of defendant's communication. Since there was some competent and credible evidence on the issue of damages, we find no error in the jury's determination of damages.

The third assignment is overruled.

*Judgment affirmed.*

NAHRA and KARPINSKI, JJ., concur.

### *APPENDIX*

### WHO THE HELL IS DANNY SMITH?

I've been hearing this question more and more lately, and it deserves an answer. Since a good number of us worked at the Euclid plant where Smith comes from, we are fairly familiar with his record:

1) He is the ex-shop chairman who earned 2 (two!) well deserved nicknames during his less than illustrious career: "Dan the company man" and "Danny no-balls."

2) He is the ex-Union official I heard making a speech to the members one day while standing next to the plant manager, that went something like this: "You guys better make more pieces, because the company needs more production to keep your jobs, and if you don't cut down on your breaks and increase production, you will start getting some reprimands!"

3) He is the guy who accepted an all expense paid vacation to Portugal to accompany Euclid plant management. Some said they took Danny along as a booth [*sic* ] licker because he fit the role so well, but I'm sure that was just a

rumor. At the time, management was considering places to transfer the work from Euclid, and visited some "slave" shops to learn how to squeeze the blood out of the people until then, to pay for it. They needed Danny's assistance to succeed!

4) He is the ex-official who reopened the Local contract about 3–4 months before its natural expiration in 1990, and when I asked him why, he whimpered like a little mouse: "Well, the company wanted it, they needed some concessions."

5) He is the ex-shop chairman who led both negotiations for all the concessions during the two Local contract talks in 1990, and I was told by some members of his former negotiating team who were in the know, that he had secret meetings with management in and out of the plant by himself and behind their back. *Some* of the results of his negotiating abilities:

A. Brought into the plant a *Non–Union* leather company to set up a crib and to *eliminate* the jobs of material handlers. Gave away the 23 min. breaktime and reduced it to 12 min.

B. Agreed to prohibit anyone bringing any personal items onto the shop floor, and as a consequence a man got a D.L.O. for reading his *Bible* by his machine *during his lunchtime!*

6) He is the ex-Union official I heard at the school auditorium during ratification meeting threaten the membership with the plant closing down if they don't vote for the concessions he negotiated. Those concessions paid the company's expenses of moving the jobs from Euclid to Mexico and Canada. (but Smith was too stupid to see that even when it was explained to him in detail!)

7) He is the ex-shop chairman who appointed his wife as a committeeman (or woman) when a vacancy occured [*sic* ], but wouldn't you know it, she turned out to have more balls than he did!

8) He is the ex-official whose actions and/or inactions got the working conditions so outrageously awful, that he couldn't even stand it any longer it seems, so he disappeared from the Euclid plant on a Friday, and by the wave of the company's magic wand, he reappeared in this plant on a Monday. Slick, huh?

9) He is the guy whose qualification as a Union official was best described to me by one of his former constituents who always tells it like it is, when he said: "Danny Smith wouldn't make a pimple on a Union man's ass, but he makes the best company man any management could hope to have in the Union." Amen!!

10) He is also the candidate for Alternate in our Dist. # 2, who recently made statements to the effect, that winning this election would assure him first shift, and lot of overtime. What a piss-poor reason to run for Union office!!!

11) And finally, he is the ex-shop chairman I was warned not to criticize openly or write anything about (I listen so well!), (because he can't stand criticizm (*sic*) and he likes to file lawsuits so much, he even filed one against his own Union at Euclid!) Of course, he didn't get anywhere with it, but that's not the point. It seems he's never been informed, that any idiot can file a lawsuit for anything under the sun. It only takes about $30, but winning it is a different ballgame. It's also obvious, that he never heard of the Taft–Hartley Act, or the N.L.R.B. Even a half-baked Union official is familiar with their laws and rules on Union affairs, elections, campaigns, et. And how about Truman's advice: "If you can't stand the heat, keep your ass the hell out of the kitchen!"

12) To be sure, and to be fair, there are many former U.A.W. officers in this plant from other Locals who served their constituents with ompetence [*sic*] and distinction. Danny Smith is just most definitely NOT one of them!!

So, it is your responsibility to yourself to find out about the candidates *before* the election, and if you need verification of the above, feel free to call the Euclid Local (what's left of it) or ask any former Euclid member.

/s/ Ted Papp
Ted Papp, Dept. # 43
Formerly of Euclid

P.S. Wonder why this is printed on yellow? When it comes to standing up for your best interest, it's the closest match for the streak on Danny Smith's back!!!