OPINION
{¶ 1} Appellant-plaintiff, American Readers Services Corp. ("ARSC"), appeals from a Shelby County Common Pleas Court judgment, granting summary judgment in favor of appellee-defendants Amos Press Inc. ("Amos") and Terri Wise (hereinafter jointly referred to as "appellees"). ARSC contends the court erred in granting summary judgment, because there was a genuine issue of material fact as to whether appellees exceeded the scope of the common interest qualified privilege and whether the appellees published the article with actual malice. Further, ARSC argues the court erred in holding that certain statements were constitutionally protected opinions or substantially true. Finding that appellees possessed a qualified privilege to publish the article and that ARSC failed to prove appellees published the article with actual malice, we affirm the judgment of the trial court.
 {¶ 2} Amos, a publisher in Sidney, Ohio, publishes a number of hobby magazines and newspapers, including Coin World. CoinWorld is a weekly newspaper for coin collectors. Wise is Amos' circulation director. To sell new magazine subscriptions, Amos hired the clearinghouse National Community Services ("NCS"). NCS had direct authority, as an agent, to make Coin World sales for Amos. Amos provided NCS with specified terms and prices for selling Coin World. At the time in question, NCS was not permitted to sell more than a one-year subscription to any customer and was only permitted to sell either fifty-two issues for thirty-four dollars and ninety-five cents ($34.95) or twenty-six issues for seventeen dollars and ninety-five cents ($17.95).
 {¶ 3} Because Amos and NCS had not entered into a specific business contract, their business relationship and all other terms for sales were governed by the Magazine Publications Guidelines. Under the Magazine Publications Guidelines, NCS was permitted to hire sub-agents to make sales, but was required to report the names of any sub-agents to the publisher. While NCS was permitted to use sub-agents under the guidelines, Amos had hired NCS under the belief that NCS did not use sub-agents. Additionally, Amos only allowed the sale of new subscriptions forCoin World, rather than renewal subscriptions, and only allowed the new subscriptions to be sold by direct mail solicitation, rather than by telemarketing. Neither restriction was required in the guidelines.
 {¶ 4} ARSC is an independent magazine subscription sales company located in Washington State. ARSC sells subscriptions for a number of different magazines, though it has no direct relationship with any publisher. At the time in question, ARSC was working through Publications Unlimited. Publications Unlimited worked for NCS. Each month Publications Unlimited would provide ARSC with a list of all publications it was authorized to sell. This list included the sale's price and terms, the subscription price of each publication, as well as occasional special instructions, allowing for only new subscriptions sales. From that list ARSC would select a number of publications to sell. ARSC uses telemarketing as its exclusive means for selling magazines.
 {¶ 5} It is undisputed that from 1999 to 2001, ARSC was selling subscriptions to Coin World. Through Publications Unlimited, ARSC was provided with the information to sell CoinWorld. According to ARSC, they were authorized to sell CoinWorld, through Publications Unlimited, at a price of twenty-nine dollars and ninety-five cents ($29.95) per year and were never told they could not use telemarketing as a means of making subscriptions. While not expressly authorized to sell renewals, ARSC did sell multiple one year subscriptions to the same customer.
 {¶ 6} It is also undisputed that from 1999 through 2001, Amos accepted seventy-one Coin World subscriptions from NCS, which had been generated by ARSC. Fifty-nine of those subscriptions were renewals, submitted as multiple one year subscriptions several weeks apart.
 {¶ 7} In late 2000 and early 2001, Amos began receiving a number of complaints from Coin World subscribers regarding sales agents who "hounded" them to buy renewals. During this time, Amos received over 100 complaints about an entity call Publishers Service Exchange. Publishers Service Exchange is unrelated to Publications Unlimited, which ARSC dealt with. Based on those complaints, its past history with unauthorized sales agents, and its own subscription and agency records, appellees determined Publishers Service Exchange was an unauthorized agent. On April 16, 2001, appellees published an article in Coin World
warning its readers that Publishers Service Exchange was unauthorized to sell Coin World and that parties who had ordered through Publishers Service Exchange should contact CoinWorld.
 {¶ 8} Following the publication of that article, Appellees received a complaint from one customer who had gone through ARSC and had not yet received his new subscription. On April 23, 2001, Appellees published an article in Coin World, informing readers that ARSC was improperly selling Coin World subscriptions. The article stated that ARSC was improperly selling by phone, that it was unauthorized to sell renewals, and that its prices and terms were unauthorized. Further, the article quoted Wise as stating:
`American Readers Services Corp. is not an authorized agentfor Coin World. They are taking peoples' money with no intentof delivering a product. They are a scam operation.'
The article was also posted on Coin World's website.
 {¶ 9} On June 4, 2001, ARSC sent a letter to appellees, demanding that Coin World remove the article from its web page and print a retraction. Appellees pulled the article from its website June 21, 2001. Amos then requested that ARSC provide Amos with a list of all Coin World subscriptions it sold. At that time, Amos verified that all Coin World subscriptions ARSC had sold had been filled. In October of 2001, Coin World printed a retraction article.
 {¶ 10} In January of 2002, ARSC filed suit against appellees, asserting libel and libel per se based upon its allegations that appellees did not act "reasonably" in attempting to discover the truth of the statements at issue. In its complaint, ARSC alleged that appellees acted with reckless disregard for the truth, or, at the least, in a negligent manner in publishing, without privilege, false and defamatory statements about ARSC. ARSC also alleged appellees tortiously interfered with ARSC's prospective business relations with its customers. Finally, ARSC alleged that appellees disparaged the goods, services and business of ARSC by false representation of fact, in violation of Ohio Deceptive Trade Practice Act, R.C. 4165.22.
 {¶ 11} Pursuant to Civ.R. 56(C), appellees filed a motion for summary judgment. The court found that appellees' publication was in good faith and that a common interest privilege applied. Further, the court found that because there was no evidence of a subjective doubt of truth, ARSC was not able to prove actual malice. Finally, the court found that some statements were true and some were protected opinions. Accordingly, the court granted summary judgment in appellees' favor.
 {¶ 12} It is from this judgment ARSC appeals, presenting the following assignments of error for our review.
 ASSIGNMENT OF ERROR NO. I The Trial Court erred in finding there was no genuine issue ofmaterial fact as to whether defendants/appellees exceeded thescope of the common interest qualified privilege.
 ASSIGNMENT OF ERROR NO. II The Trial Court erred in finding there was no genuine issue ofmaterial fact as to whether the defendants published theirstatements with actual malice.
 {¶ 13} In the first assignment of error, ARSC claims appellees exceeded the scope of any common interest privilege that they may have had. In the second assignment of error, ARSC claims that there was a genuine issue of material fact as to whether the appellees possessed actual malice. Because these assignments of error are interrelated, we will consider them together.
 {¶ 14} Under Ohio law, a court may not grant a motion for summary judgment unless the record demonstrates: (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law; and (3) that, after considering the evidence most strongly in the nonmovant's favor, reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.[1] In ruling on a summary judgment motion, the trial court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmovant.[2] Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the adverse party.[3] Appellate review of summary judgment determinations is conducted on a de novo basis;[4] therefore, this court considers the motion independently and without deference to the trial court's findings.[5]
 {¶ 15} Liability for defamation exists when a false and defamatory statement about a person is published to a third person.[6] However, if a defamatory statement is privileged, liability only attaches if actual malice is proven.[7]
 {¶ 16} In the case sub judice, the defamation claim turns on whether Appellees possessed a qualified privileged to publish the article.
 {¶ 17} The Ohio Supreme Court first recognized the qualified privilege as a defense in a defamation action in Hahn v.Kotten.[8] The qualified privilege concept is based in public policy, and is therefore, applicable where society's interest in being protected by the dissemination of information outweighs the loss of reputation to the party defamed.[9]
"Implicit in the defense is a commonality of interest between the speaker and recipient, a public or private duty, either legal or moral, to speak on the matter."[10] Accordingly, "to establish a qualified publication the defendant must show that (1) the publication was made in good faith, (2) there was an interest to be upheld, (3) the publication was limited in scope to that interest, (4) the publication was made on the proper occasion, and (5) the publication was done in a proper manner and to the proper parties."[11]
 {¶ 18} Upon a review of the entire record, we find that appellees' publication of the article was covered by the affirmative defense of qualified privilege. First, the article appears to have been published in good faith, and appellees had a legitimate interest to uphold. According to the depositions of Wise, the circulation director, Michael Laurence, the senor editor for Amos, and Elizabeth Deisher, editor for Coin World
and the author of the article, the article was published because of past problems with unauthorized sub-agents and the customer complaint about ARSC. Based on the information that appellees had at the time, the article was published to protect the subscribers of Coin World from fraud. The record is absolutely void of any evidence that Appellees had anything but their subscribers' best interests in mind. The article was published with no ill intent, and the sole purpose of the publication was to protect CoinWorld's subscribers.
 {¶ 19} Second, the article was also limited in scope to the interest of protecting the Coin World subscribers. The article provided information about the complaints Coin World had been receiving about unauthorized agents, its investigation into those agents, as well as stated the authorized prices and terms for subscription. While there were references to ARSC, appellees believed that the above information was necessary to protect the subscribers of Coin World. Accordingly, the article was specifically limited to appellees' interest in protecting the subscribers.
 {¶ 20} Third, the article was published on the proper occasion, in a proper manner and to the proper parties. Appellees published the article in the Coin World magazine and also placed the article on the Coin World website. Because the sole purpose of the article was to protect the Coin World
subscribers, it was reasonable that the article be published to that audience. Thus, appellees' publication of the print article was published in the manner and directed to the audience necessary to achieve the goal of protecting those subscribers. And, although the website publication had the potential to reach a broader audience, there was no evidence provided that it actually did. Further, the contents of the article was limited to appellees' intended interest of protecting the subscribers. Accordingly, appellees did not overstep the privilege.
 {¶ 21} While ARSC argues that some of appellees' statements "grossly exceeded the scope of any `common interest' they purportedly had to uphold," we cannot find that appellees exceeded the privilege. Specifically, ARSC points to Wise's comments that ARSC was "taking people's money with no intent to deliver a product," and that ARSC was "a scam operation." According to ARSC, these statements went beyond the warning necessary to protect Coin World subscribers. While in isolation these statements may seem to do more than merely warn, these statements must be reviewed within the context in which they were presented.[12] When viewed in the context of the article, these statements were used to help warn Coin World subscribers of the possible danger. Reading the article in its entirety and based on the understanding of the situation that appellees then had, we are unable to find the statements exceeded the scope of Appellees' privilege, considering the interest appellees had in protecting the Coin World subscribers.
 {¶ 22} Having found that appellees published the article in good faith to uphold a valid interest, that the article was limited in scope to that interest and that the article was published on the proper occasion and in the proper manner, appellees possessed a qualified privilege to publish the article. Since they did not exceed the scope of that privilege, the first assignment of error is overruled.
 {¶ 23} Having found appellees possessed a qualified privilege to publish the article, ARSC can only defeat that privilege by presenting clear and convincing evidence that the article was published with actual malice.[13] Actual malice is established by showing that statements were made "with knowledge that the statements were false or with the reckless disregard as to their truth or falsity."[14] "Reckless disregard may be established by evidence showing that the alleged defamer had serious doubts about the truth of the statements."[15] In other words, it is insufficient for a plaintiff to merely show that the statements were false, "rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity."[16]
 {¶ 24} After reviewing the entire record, we conclude that there is no evidence demonstrating that the article was published with knowledge that the statements were false or in reckless disregard for the truth. Essentially, the record shows that Wise, Laurence and Deisher all believed that ARSC was not a legitimate sub-agent and that it was attempting to take Coin World
subscriptions without fulfilling those orders. Amos had had several problems with unauthorized agents in the past and had received a complaint about ARSC. Further, when Wise checked the authorized sub-agent list, ARSC was not listed. At that point, Wise was convinced that ARSC was an unauthorized agent and wanted to make sure that the Coin World subscribers were quickly warned.
 {¶ 25} Additionally, ARSC contends that appellees' failure to investigate relevant sources within their possession, which would have identified ARSC as an authorized sub-agent, can be used to infer actual malice on appellees' part. A later investigation did, in fact, reveal that ARSC was an authorized sub-agent under Publications Unlimited; however, that revelation is not relevant to determine whether the article was published with actual malice. "A failure to investigate will not, in absence of evidence that the alleged defamer entertained serious doubts
about the statements in question, defeat a qualified privilege."[17] While ARSC argues that Appellees could have done substantially more investigation into the issue prior to publishing the article, there is no evidence that Appellees either believed that ARSC was an authorized agent or entertained a serious doubt that it was not. Accordingly, upon the evidence before us ARSC is unable to prove actual malice on the part of appellees.
 {¶ 26} Having found that ARSC has failed to carry its burden with regard to establishing actual malice, we find the court properly granted summary judgment.
Accordingly, the second assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. III The Trial Court erred in holding that one of defendants'statements constitutes a protected opinion.
 ASSIGNMENT OF ERROR NO. IV The Trial Court erred in holding that defendants' statementswere true or substantially true.
 {¶ 27} In the third and fourth assignments of error, ARSC asserts that the court erred in finding certain statements were either protected opinions or substantially true. Because we determined that summary judgment was properly granted on the basis that the Coin World article was protected by a qualified privilege and that ARSC was unable to prove actual malice, it is unnecessary for this court to address the remaining two assignments of error. Pursuant to App.R. 12(A)(1)(c), these assignments have been rendered moot.
 {¶ 28} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
Walters, P.J. and Shaw, J., concur.
[1] Civ. R. 56(C); Horton v. Harwick Chemical Corp. (1995),73 Ohio St.3d 679, 686-87.
[2] Good v. Krohn, (2002), 151 Ohio App.3d 832, 835, citingJacobs v. Racevskis (1995), 105 Ohio App.3d 1, 7.
[3] Hannah v. Dayton Power Light Co. (1998),82 Ohio St.3d 482, 485.
[4] Griner v. Minster Bd. of Edn. (1998),128 Ohio App.3d 425, 430.
[5] J.A. Industries, Inc. v. All American Plastics, Inc.
(1999), 133 Ohio App.3d 76, 82.
[6] Ball v. British Petroleum Oil (1995),108 Ohio App.3d 129, 135, citing McCarthy v. Cincinnati Enquirer, Inc. (1956),101 Ohio App. 297, 300.
[7] Jacobs v. Frank (1991), 60 Ohio St.3d 111, paragraph two of the syllabus.
[8] (1975), 43 Ohio St.2d 237.
[9] See AB-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg Constr. Trades Council (1995), 73 Ohio St.3d 1, 8.
[10] Thompson v. Webb (1999), 136 Ohio App.3d 79, 84, citingAB-Abell, supra; see, also, Jacobs,60 Ohio St.3d at 113-114.
[11] Id.
[12] Perk v. Readers Digest Association, Inc. (1991),931 F.2d 408, 411.
[13] Hahn, 43 Ohio St.2d at 244.
[14] Jacobs, 60 Ohio St.3d at 118.
[15] Thompson, 136 Ohio App.3d at 85; see, also, A B-Abell, 73 Ohio St.3d at 12-13; Hahn, 43 Ohio St.2d at 244.
[16] Dupler v. Mansfield Journal (1980), 64 Ohio St.2d 116,122-123; see, also, New York Times Co. v. Sullivan (1964),376 U.S. 254, 286, 84 S.Ct. 710.
[17] Thompson, 136 Ohio App.3d at 85 (emphasis added); see, also, A B-Abell, 73 Ohio St.3d at 12-13.