[Cite as *Weaver v. Deevers*, 2021-Ohio-3791.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| GRETCHEN A. WEAVER, et al., | **CASE NO. 2020-P-0087** |
| Plaintiffs-Appellants, | |
| - v - | Civil Appeal from the Court of Common Pleas |
| MATTHEW DEEVERS, et al., | Trial Court No. 2019 CV 00718 |
| Defendants-Appellees. | |

**O P I N I O N**

Decided: October 25, 2021
Judgment: Affirmed

*John C. Fickes*, Roderick Linton Belfance, LLP, 50 S. Main Street, 10th Floor, Akron, OH 44308, and *Emery J. Leuchtag*, 526 S. Main Street, Suite 407, Akron, OH 44311 (For Plaintiffs-Appellants).

*Thomas H. Cabral* and *Joseph Monroe, II*, Gallagher Sharp, LLP, 1215 Superior Avenue, 7th Floor, Cleveland, OH 44114 (For Defendants-Appellees Matthew Deevers and Shannon L. Deevers).

*Terrence J. Kenneally* and *Sean M. Kenneally*, Terrence J. Kenneally & Associates, 19111 Detroit Road, Suite 200, Rocky River, OH 44116 (For Defendants-Appellees Ginger E. Maines and Jeffrey K. Maines).

*James A. Climer, Frank H. Scialdone,* and *John D. Pinzone*, Mazanec, Raskin & Ryder Co., LPA, 100 Franklin's Row, 34305 Solon Road, Cleveland, OH 44139 (For Defendants-Appellees Streetsboro City Schools Board of Education, Aireane Curtis, Brian Violi, John Kelly, and R. Michael Daulbaugh).

THOMAS R. WRIGHT, J.

{¶1} Plaintiffs—Gretchen A. & Thomas J. Weaver and Shane L. & Scott Ellsworth—appeal the trial court's order granting summary judgment in favor of all

defendants—Matthew and Shannon L. Deevers ("the Deevers"); Ginger E. and Jeffrey K. Maines ("the Maines"); Streetsboro City Schools Board of Education ("the Board"); and R. Michael Daulbaugh, Aireane Curtis, Brian Violi, and John Kelly (collectively "the School Defendants").

{¶2} Mrs. Gretchen A. Weaver ("Weaver") was a music teacher and the band director at Streetsboro High School from 2005 through September 2016. Mrs. Shane L. Ellsworth ("Ellsworth") was a music teacher and the assistant band director at Streetsboro High School from 2001 through September 2016. R. Michael Daulbaugh and Aireane Curtis are Superintendent and Assistant Superintendent, respectively, of Streetsboro City Schools. In 2016, John Kelly was the President of the Board; in 2017, that role was filled by Brian Violi.

{¶3} Each summer for the past 25 years, the high school band directors have conducted a marching band camp at Camp Muskingham in Carroll County. In 2016, the Deevers' daughter M.D. was an incoming senior member of the band, and the Maines' daughter S.M. was an incoming freshman member of the band. Both students attended the 2016 band camp, which was held from Friday, July 29, through Monday, August 1.

{¶4} On August 1, 2016, a few hours after band camp had concluded, the Deevers sent an e-mail to Superintendent Daulbaugh; James Hogue, the high school principal; and Jeffrey Keruski, the intermediate school principal and a harassment compliance officer. The Deevers complained that hazing and harassment of students had occurred during band camp and requested a formal investigation of specific alleged violations of the Board's anti-hazing and anti-harassment policies.

2

{¶5}    The following day, Mrs. Maines called Superintendent Daulbaugh with a complaint about band camp.  He requested she send her concerns in writing.  Mrs. Maines then sent an e-mail to Superintendent Daulbaugh with a statement prepared by S.M. and edited by Mrs. Maines, describing various activities S.M. said had taken place at band camp and attributing various statements to Weaver and Ellsworth.   Mrs. Maines additionally accused student leaders of bullying their classmates.

{¶6}    Board Policy 5517 prohibits "harassment," which includes bullying; sexual harassment; harassment based on race, color, religious, creed, national origin, ancestry, or disability; and various other forms of conduct, communication, threats, insults, or dehumanizing gestures.   Board Policy 5516 prohibits "hazing," which is defined as "performing any act or coercing another, including the victim, to perform any act of initiation into any class, team, or organization that causes or creates a substantial risk of causing mental or physical harm.   Permission, consent, or assumption of risk by an individual subjected to hazing shall not lessen the prohibitions contained in this policy."  Also, although the parents did not accuse the teachers of committing a crime, "hazing" could be prosecuted as a fourth-degree misdemeanor under former R.C. 2903.31, in effect at that time.

{¶7}    Superintendent Daulbaugh directed Assistant Superintendent Curtis to conduct the investigation under his supervision and with the assistance of retained counsel.  Assistant Superintendent Curtis delivered a letter to Weaver and Ellsworth on August 4, 2016, informing them of a complaint against them regarding activities at band camp, to wit:

> The nature of the allegations are that the band camp has a culture of harassment, intimidation, teasing, and public

3

humiliation occurred [sic] during the 2016 band camp. Of specific concern are the senior skit night, the throwing of students into a lake by seniors, the 'great swami' skit performed by school staff members, the percussion section 'stitch-n-bitch' skit, and the band camp salon skit.

The letter provided that Weaver and Ellsworth could submit a written response within five business days and that they would be interviewed during an investigation regarding the complaint.

{¶8} On August 9, 2016, notices of administrative suspension were sent to Weaver and Ellsworth relieving them of their duties, with pay, pending the outcome of an investigation into allegations that they had engaged in professional misconduct by participating in and condoning hazing and harassment activities. The letter directed Weaver and Ellsworth to turn in their school keys and instructed them not to speak of the matter with anyone associated with the school, excepting their union representatives.

{¶9} News of the suspension began circulating on social media. On August 15, 2016, Superintendent Daulbaugh issued a "robo-call" to parents of all students in the school district and posted a message to the school district website regarding the allegations and investigation, and also informing them that the district was finalizing the hiring of an interim band director. News reports began to appear on television and in newspapers and online publications. A formal and public meeting of the Board took place on August 17, 2016, during which Board President Kelly read a statement regarding the allegations and investigation.

{¶10} Assistant Superintendent Curtis conducted various interviews over the next two months, and counsel for the school district conducted investigatory interviews of Weaver and Ellsworth in October 2016 with their union representatives present. None of

4

these interviews were transcribed or recorded. The Board subsequently retained Norman J. Pollard, Ed.D., to provide them with a report and opinion. He interviewed M.D. and S.M. by telephone; he did not interview Weaver or Ellsworth. Dr. Pollard's professional opinion was that many of the activities constituted hazing in violation of Board policy and Ohio law, and that Weaver, Ellsworth, and other adults should be held accountable.

{¶11} On December 15, 2016, Weaver and Ellsworth were provided written notice of the specific allegations against them. Through their union representative, they denied all allegations during an informal meeting with Superintendent Daulbaugh. Finally, in January 2017, the Board voted to suspend Weaver and Ellsworth from their duties without pay or benefits and to consider terminating their contracts.

{¶12} Weaver and Ellsworth appealed the Board's decision, pursuant to R.C. 3319.16, and a hearing was held before an appointed referee over the course of 14 days. In the referee's report of December 11, 2017, the referee found that although many of the complained of activities had occurred at the 2016 band camp, they did not rise to the level of hazing in violation of Board policy. The referee recommended restoring Weaver and Ellsworth to their positions and issuing lesser discipline for what he characterized as multiple instances of "fairly serious" misconduct in violation of other Board policies.

{¶13} The Board held a special meeting on December 28, 2017. The Board reviewed the referee's report and accepted some of the findings but ultimately voted to uphold its prior decision based on the referee's conclusion that the teachers had engaged in multiple instances of "fairly serious" misconduct.

{¶14} Weaver and Ellsworth filed original actions in the Portage County Court of Common Pleas, pursuant to R.C. 3319.16, challenging the Board's decision. The

5

common pleas court summarily dismissed the actions, followed by findings of fact and conclusions of law, and this court affirmed. *Ellsworth v. Streetsboro City School Dist. Bd. of Edn.*, 2019-Ohio-4731, 136 N.E.3d 549 (11th Dist.).

{¶15} Neither Weaver nor Ellsworth has since found employment as a school teacher or school band leader.

{¶16} On September 10, 2019, Weaver and Ellsworth, joined by their spouses, filed a complaint for money damages against the Deevers, the Maines, the Board, and the School Defendants. They alleged defamation, intentional infliction of serious emotional distress, civil conspiracy, and loss of consortium. During the course of discovery, depositions were taken of Weaver and Ellsworth, Superintendent Daulbaugh, Assistant Superintendent Curtis, and the Deevers' daughter M.D.

{¶17} Motions for summary judgment were filed by all defendants, which the trial court summarily granted. The court additionally held the Board was entitled to R.C. Chapter 2744 immunity on all claims. From this decision, appellants advance three assignments of error, arguing none of the defendants are entitled to judgment as a matter of law because genuine issues of material fact exist:

> [1.] The trial court erred in granting the School District's motion for summary judgment.
>
> [2.] The trial court erred in granting the Deevers' motion for summary judgment.
>
> [3.] The trial court erred in granting the Maineses' motion for summary judgment.

{¶18} We review decisions awarding summary judgment de novo, i.e., independently and without deference to the trial court's decision. *Grafton v. Ohio Edison*

6

*Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Peer v. Sayers*, 11th Dist. Trumbull No. 2011-T-0014, 2011-Ohio-5439, ¶ 27.

{¶19} Summary judgment is appropriate only when "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977), citing Civ.R. 56(C). The initial burden is on the moving party to set forth specific facts demonstrating that no issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the movant meets this burden, the burden shifts to the nonmoving party to establish that a genuine issue of material fact exists for trial. *Id.* at 293.

{¶20} Initially, "a claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.,* 63 Ohio St.3d 84, 92-93, 585 N.E.2d 384 (1992). "Bodily injury" does not include non-physical harms such as emotional distress. *Morgan v. Ent. Rent-A-Car*, 11th Dist. Trumbull No. 98-T-0103, 2000 WL 523085, *6 (Mar. 31, 2000), and *Blatnik v. Avery Dennison Corp.*, 148 Ohio App.3d 494, 2002-Ohio-1682, 774 N.E.2d 282, ¶ 95 (11th Dist.), citing *Tomlinson v. Skolnik*, 44 Ohio St.3d 11, 14, 540 N.E.2d 716 (1989), *overruled on other grounds*, *Bowman v. Holcomb*, 83 Ohio App.3d 216, 218-219, 614 N.E.2d 838 (12th Dist.1992), and *Vance v. Sang Chong, Inc.*, 11th Dist. Lake No. 88-L-13-188, 1990 WL 174121, *3 (Nov. 9, 1990).

7

Thus, because appellants did not allege bodily injury, or physical harm, to either Weaver or Ellsworth, defendants were entitled to summary judgment in their favor on the loss of consortium claims.

{¶21} We next consider R.C. Chapter 2744, the Political Subdivision Tort Liability Act, applicable to political subdivisions and their employees. Appellants focus on the applicability of R.C. 2744.09(B), which provides that the immunity generally granted to political subdivisions does not apply to "[c]ivil actions by an employee * * * against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision[.]" This latter provision "'is designed to protect employees by allowing them to recover against their employers, who would otherwise be entitled to immunity under R.C. Chapter 2744.'" *Piazza v. Cuyahoga Cty.*, 157 Ohio St.3d 497, 2019-Ohio-2499, 138 N.E.3d 1108, ¶ 12, quoting *Sampson v. Cuyahoga Metro. Hous. Auth.*, 131 Ohio St.3d 418, 2012-Ohio-570, 966 N.E.2d 247, ¶ 13. It is undisputed that Weaver's and Ellsworth's intentional tort claims are relative to a matter that arose out of their employment relationship with the Board. We therefore conclude that immunity does not extend to the Board. Although the trial court erred in holding otherwise, it is not dispositive to the appeal.

{¶22} As employees of a political subdivision, the School Defendants are immune from liability unless "(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." R.C. 2744.03(A)(6); *Kravetz v. Streetsboro Bd. of Edn.*, 11th Dist. Portage No.

8

2011-P-0025, 2012-Ohio-1455, ¶ 17. Although appellants have not specifically argued against application of these immunity exceptions to the School Defendants, appellants do contend that they acted with malice and, at times, in contravention of Board policies and procedures. Accordingly, a conclusion that the School Defendants are entitled to immunity necessarily depends upon whether appellants demonstrated a genuine issue of material fact as to the requisite level of culpability for their claims of defamation, intentional infliction of emotional distress, and civil conspiracy.

{¶23} "The elements of the common-law action of defamation are (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." (Citation omitted.) *Weber v. Ferrellgas, Inc.*, 2016-Ohio-4738, 68 N.E.3d 207, ¶ 42 (11th Dist.); *also Hahn v. Kotten*, 43 Ohio St.2d 237, 243, 331 N.E.2d 713 (1975).

{¶24} "Even in a case where a plaintiff has established a *prima facie* case of defamation, a defendant may invoke the defense of conditional or qualified privilege." *Lakota Loc. School Dist. Bd. of Edn. v. Brickner*, 108 Ohio App.3d 637, 647, 671 N.E.2d 578 (6th Dist.1996), citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E.2d 1283 (1995) and *Hahn* at 243. "In a case where it is found that a conditional or qualified privilege does exist, the burden is on the plaintiff to demonstrate, by clear and convincing evidence, that the defamatory statements were made with 'actual malice.'" *Lakota* at 647-648, citing *Jacobs v. Frank*, 60 Ohio St.3d 111, 573 N.E.2d 609 (1991), paragraph two of the syllabus. "Where the

9

circumstances of the occasion for the alleged defamatory statement are not in dispute, the determination of whether there is a qualified privilege is a question of law for the trial court." *Lakota* at 648, citing *A & B-Abell Elevator* at 7.

{¶25} "'A publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'" *A & B-Abell Elevator* at 8, quoting *Toogood v. Spyring*, 149 Eng.Rep. 1044, 1049-1050, 1 C.M. & R. 181, 193 (1834).

> "A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation."

*Hahn* at 245-246, quoting 33 American Jurisprudence, at 124 (1941) (Libel and Slander, Section 126).

{¶26} Here, there is no dispute as to the circumstances under which the alleged defamatory statements were made or as to the exact content of those statements. On August 15, 2016, Superintendent Daulbaugh issued the following "robo-call" to every family in the school district:

> The band program has been suspended until we finish our investigation into claims that students may have been hazed, demeaned and belittled during the recent band camp.

10

Case No. 2020-P-0087

I am aware of many postings on social media that would excuse the behavior as tradition or team building and group acceptance. Pushing underclass students into a lake at night in the dark without inquiring if they can swim, demeaning and mocking underclassmen in band camp skits and wrapping students in plastic wrap either to another student or to a tree are unacceptable initiation traditions. While these kinds of hazing rituals may have been the pattern and practices for decades, they are in direct violation of the established School Board policies.

The Streetsboro schools have zero tolerance for hazing, bullying or conduct that is demeaning or belittling to students. The fact that some excuse it as steeped in tradition is irrelevant and frankly it's disheartening.

We are in the process of finalizing the hiring of an interim band director who can help get our students back on the field. I will be able to share more about this development after our upcoming School Board meeting. Band members are strongly encouraged to continue to practice their instruments until school resumes.

As a former band member myself, I understand how important this program is to everyone in our District. We will do everything possible to resume the marching band program at Streetsboro High School as quickly as possible. I will continue to keep you updated on this as information warrants.

{¶27} Two days later, Board President Kelly made the following statement at a public board meeting:

After hearing an update from our Superintendent and legal counsel regarding the status of the investigation into alleged hazing at Band Camp, I want to make a couple of comments before I open this up to the floor.

- To date almost a dozen interviews have taken place.

- The interviews credibly confirm that incidents that could be characterized as hazing took place at the 2016 Band Camp and likely occurred during previous band camps. Any type of hazing violates our Board Policy.

11

Case No. 2020-P-0087

- Interviews have revealed that both this year and last year, upper classmen who characterize the conduct as "good fun" or "team building," admit that some of the conduct got "out of hand."

- This investigation will continue and changes will be made to ensure this type of conduct does not recur.

In closing, I want to say that your perspective as parents on this investigation depends on where you stand. If your child was part of the "in crowd" that relished in the behavior and looked with fondness toward the day when, as seniors, they would ascend to the position of "power," as one social media commentator noted, then you are probably prepared to rail against our Superintendent's actions in trying to get to the bottom of this matter. You will try to dismiss this as "good clean fun" and "rite of passage" stuff that builds character. Before you start down that road, I will tell you your perspective will stand in significant contrast to the parents of the children who felt frightened and intimidated by this conduct and went so far as to quit band because of it. Over the past two years 14 students have quit band. Although we don't know why all 14 chose to quit we find the number concerning.

There has been much said in the media about students being swim tested and wrist banded before participating in the lake toss. Based upon our investigation thus far we feel confident that at least two students without wristbands participated that night and at least one could not swim. Additionally we feel confident based upon interviews that some students were picked up and thrown into the lake.

As adults we know that there are lots of different kids walking through our hallways. Confident kids with strong self-esteem and less confident kids struggling to find their place in our halls. This Board of Education, our Superintendent, Administrators, Teachers and staff are responsible for the safety of all of these children and we take this responsibility seriously.

So if you plan to dismiss our investigation because you think the alleged "hazing" sounds not "that bad" or just "good clean fun," understand that your speech will not change our position that every child in our care deserves to be educated in a safe environment free from this type of activity.

Case No. 2020-P-0087

"Team building" and developing "esprit de corps" can and must be done without abusing power over the underclass students who deserve to be treated with respect. To those parents and former band members who insist that "this is the way it's always been" our message should be clear. This is <u>not</u> the way it will be in the Streetsboro City Schools from now on.

{¶28} There should be no dispute, and we conclude as a matter of law, that both statements were issued under occasions of qualified privilege. The Board, Daulbaugh, and Kelly have a duty to ensure the safety and welfare of the students in the school district. In the performance of that duty, the statements were communicated to parents in the school district to further their corresponding interest in the safety and welfare of their children. We likewise conclude that the Deevers' e-mail and Mrs. Maines' e-mail are protected under the inverse application of the same qualified privilege, as they have an interest in the safety and welfare of their children and communicated statements of concern to school officials with a duty to ensure the students' safety and welfare. *See, e.g.*, *Daubenmire v. Sommers*, 156 Ohio App.3d 322, 2004-Ohio-914, 805 N.E.2d 571, ¶ 122 (12th Dist.), quoting *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 356, 609 N.E.2d 216 (6th Dist.1992) ("'[E]ducators and parents share a common interest in the training, morality and well-being of the children in their care.'").

{¶29} Moreover, appellants have not offered any evidence that the statements were not made in "good faith" or were made with "actual malice." Statements are made with "actual malice" when they are made with knowledge that they are false or with reckless disregard as to their truth or falsity. *Jacobs*, 60 Ohio St.3d at 116. Thus, there must be a showing that the false statements were made with a high degree of awareness

13

of their probable falsity. *Id.* at 118. Further, the alleged defamatory statements must be viewed with regard to the subjective belief of the author. *Id.* at 119.

{¶30} Appellants characterize Superintendent Daulbaugh's statement as "accus[ing] the SHS Marching Band directors of hazing, bullying, and harassing their students" and Board President Kelly's statement as "'credibly confirm[ing]' that hazing had occurred at band camp." This is not, however, an accurate or fair characterization. Daulbaugh did not accuse Weaver and Ellsworth of the hazing, demeaning, or belittling that was the subject of the Board's investigation, and Kelly expressly stated that the incidents *could* be characterized as hazing and that the investigation would continue. There is no indication in either statement that the speakers believed Weaver and Ellsworth were the perpetrators of the behavior, as opposed to chaperones or student band leaders.

{¶31} Appellants take issue with the Deevers and Mrs. Maines sending e-mail accusations without first inquiring of others who were at the band camp, particularly the adults, to corroborate the accounts of their daughters, who appellants describe as "sources [that] may not be inherently reliable." Appellants contend this was reckless behavior, considering the gravity of the allegations. There is no evidence, however, that the Deevers or Mrs. Maines subjectively believed or had a high degree of awareness that any part of the information relayed by their daughters was probably false.

{¶32} Appellants have not demonstrated that a genuine issue of material fact exists regarding lack of "good faith" or "actual malice" with respect to the Board, Daulbaugh, Kelly, the Deevers, or Mrs. Maines. Additionally, there are no statements at

14

Case No. 2020-P-0087

issue made by Curtis, Violi, or Mr. Maines. Accordingly, summary judgment in favor of the defendants on the claim of defamation was proper.

{¶33} "In a case for intentional infliction of emotional distress, a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." (Citation omitted.) *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410-411, 644 N.E.2d 286 (1994); *Valentino v. Wickliffe City School Dist. Bd. of Edn.*, 11th Dist. Lake Nos. 2009-L-083 & 2009-L-089, 2010-Ohio-5515, ¶ 48. "'Whether conduct rises to the level of "extreme and outrageous" conduct constitutes a question of law.'" *Krlich v. Clemente*, 2017-Ohio-7945, 98 N.E.3d 752, ¶ 26 (11th Dist.), quoting *Jones v. Wheelersburg Local School Dist.*, 4th Dist. Scioto No. 12CA3513, 2013-Ohio-3685, ¶ 41; *accord Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 48 (10th Dist.) ("Whether conduct is 'extreme and outrageous' is initially a question of law for the court.").

{¶34} In response to the motions for summary judgment, appellants recite examples of what they maintain are extreme and outrageous conduct, to wit: the Deevers and the Maines sending e-mails to the school administrators relaying information received from their daughters without further investigation; the School Defendants' alleged departure from the Board's anti-harassment policy and subsequent "broadcasting" of the alleged defamatory statements; and the "arbitrary management of the investigation, prosecution and judgment of the band directors." These accusations are not sufficient operative facts to demonstrate that any of the defendants' conduct, as a matter of law,

15

was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983). Additionally, "[w]hen a privilege, qualified or absolute, attaches to statements made in a defamation action, those statements remain privileged for the purpose of derivative claims such as intentional infliction of emotional distress[.]" (Parallel citations omitted.) *Gintert v. WCI Steel, Inc.*, 11th Dist. Trumbull No. 2002-T-0124, 2007-Ohio-6737, ¶ 22, citing *A & B-Abell Elevator*, 73 Ohio St.3d at 15. Accordingly, summary judgment in favor of the defendants was proper on this claim.

{¶35} Finally, "[a] civil conspiracy is a "'malicious combination of two or more persons to injure another, in person or property, in a way not competent for one alone.'" *Wilk v. Discover Bank*, 2019-Ohio-3842, 144 N.E.3d 1023, ¶ 53 (11th Dist.), quoting *Mangelluzzi v. Morley*, 2015-Ohio-3143, 40 N.E.3d 588, ¶ 54 (8th Dist.). "'Thus, the elements that comprise a claim of civil conspiracy are (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy. [A]n action for civil conspiracy cannot be maintained unless an underlying unlawful act is committed.'" (Internal citations omitted.) *Wilk* at ¶ 53, quoting *Mangelluzzi* at ¶ 54. As outlined above, appellants have not established that any of the defendants committed an underlying unlawful act. Accordingly, summary judgment in favor of the defendants on this claim was also proper.

{¶36} Appellants' assignments are without merit. The trial court did not err in granting the defendants' motions for summary judgment and dismissing all claims with prejudice.

16

Case No. 2020-P-0087

{¶37}   The judgment of the Portage County Court of Common Pleas is affirmed.


MARY JANE TRAPP, P.J.,

MATT LYNCH, J.,

concur.

17